[Cite as *State v. Nwachukwa*, 2015-Ohio-3282.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### MARION COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                 CASE NO. 9-15-03

      v.

AMANZE NWACHUKWA, AKA
TONY JAMES, AKA TONY SMITH,       O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 11-CR-187

Judgment Affirmed

Date of Decision: August 17, 2015

APPEARANCES:

    *Kevin P. Collins* for Appellant

    *Adam D. Meigs* for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Amanze T. Nwachukwa ("Nwachukwa"), appeals the December 11, 2014 judgment entry of sentence of the Marion County Court of Common Pleas.  He argues that the trial court erred in denying his motion to suppress evidence.  For the reasons that follow, we affirm.

{¶2} On April 28, 2011, the Marion County Grand Jury indicted Nwachukwa on one count of possession of heroin in violation of R.C. 2925.11(A), (C)(6), a second-degree felony.  (Doc. No. 1).

{¶3} On May 2, 2011, Nwachukwa appeared for arraignment and entered a plea of not guilty.  (Doc. No. 10).

{¶4} On July 22, 2011, Nwachukwa filed a motion to suppress evidence. (Doc. No. 34).  In his motion, Nwachukwa argued that he was illegally searched because "there was no search warrant"—namely, that he was unlawfully detained and did not voluntarily consent to be searched.  (*Id.*).  After the suppression hearing on July 27 2011, the State filed a memorandum in opposition to Nwachukwa's motion to suppress on August 5, 2011, and Nwachukwa filed a response to the State's memorandum in opposition to his motion to suppress on August 11, 2011.  (Doc. Nos. 38, 39).  The trial court overruled Nwachukwa's motion to suppress on August 12, 2011.  (Doc. No. 40).

{¶5} On August 15, 2011, Nwachukwa withdrew his not-guilty plea and entered a no-contest plea to the indictment. (Doc. No. 41).

{¶6} On October 7, 2011, a bench warrant was issued for Nwachukwa after he failed to appear for a presentence-investigation interview, and the case was stayed. (Doc. Nos. 43, 48).

{¶7} On December 9, 2014, after Nwachukwa was apprehended in Michigan, the trial court accepted Nwachukwa's no-contest plea, found him guilty as to the indictment, and sentenced him to five years in prison. (Doc. Nos. 56, 60). The trial court filed its judgement entry of sentence on December 11, 2014. (*Id.*).

{¶8} Nwachukwa filed his notice of appeal on January 9, 2015. (Doc. No. 71). He raises one assignment of error for our review.

### Assignment of Error

**The Trial Court Abused its Discretion by Denying Defendant-Appellant's Motion to Suppress Evidence.**

{¶9} In his sole assignment of error, Nwachukwa argues that the trial court abused its discretion in overruling his motion to suppress. Specifically, Nwachukwa argues that law enforcement officers did not have reasonable suspicion or probable cause to stop him and that he did not voluntarily consent to the search because he was illegally detained.

{¶10} Nwachukwa's assignment of error asserts that the trial court abused its discretion in denying his motion to suppress. However, the abuse-of-discretion standard of review is not the proper standard of review of a motion to suppress.

{¶11} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id. See also State v. Carter*, 72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to suppress, deference is given to the trial court's findings of fact so long as they are supported by competent, credible evidence. *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo; therefore, we must decide whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 710 (4th Dist.1997).

{¶12} Nwachukwa does not dispute the facts. (*See* Appellant's Brief at 8). As such, we will proceed directly to reviewing de novo the trial court's conclusion that Officer Andrew Isom ("Officer Isom") had a reasonable articulable suspicion to stop Nwachukwa and that Nwachukwa consented to being searched.

{¶13} At the suppression hearing, Officer Isom testified that he has been a police officer with the Marion City Police Department for 16 years. (July 27,

2011 Tr. at 2). Officer Isom testified that he encountered Nwachukwa at approximately 12:30 a.m. on August 20, 2011 after Nwachukwa arrived on a Greyhound bus traveling from Detroit, Michigan to Marion, Ohio. (*Id.* at 3-4). Officer Isom was conducting a traffic stop of a female from Detroit who told Officer Isom that "she was going to pick up a friend" at the time he stopped her. (*Id.* at 5). He testified that he became suspicious that the friend the woman was going to pick up was arriving on a Greyhound bus because, when Officer Isom returned his cruiser to write the woman a traffic ticket, he saw "the Greyhound bus go by, southbound [and the woman] kinda looked up and looked like she wanted to get out of there." (*Id.*). That the woman was from Detroit was significant to Officer Isom since Marion had "been and continue[d] to get a lot of narcotics; heroin, crack cocaine, marijuana out of Detroit." (*Id.* at 6). Based on his suspicion, Officer Isom called Detective Mark Elliott ("Detective Elliott") of the Marion City Police Department and instructed him to go to the Greyhound station. (*Id.*). After Officer Isom concluded the traffic stop of the woman, he also went to the Greyhound station. (*Id.*).

{¶14} Officer Isom testified that Detective Elliott, in an unmarked vehicle, positioned himself to observe the passengers exit the bus and watch for the vehicle that Officer Isom stopped. (*Id.* at 6-7). After spotting the vehicle that Officer Isom stopped, Detective Elliott relayed to Officer Isom that the vehicle was at the

Greyhound station and that "he was watchin' [a black male with a backpack—Nwachukwa—] that got off the bus start to walk westbound and kept lookin' back at him in his unmarked vehicle." (*Id.* at 7). Officer Isom testified that Detective Elliott informed him that Nwachukwa was walking in a different direction than the vehicle that Officer Isom stopped. (*Id.*).

{¶15} After Detective Elliott informed Officer Isom of Nwachukwa, Officer Isom observed Nwachukwa cross Main Street, where Officer Isom was positioned, and continue westbound down an alley. (*Id.* at 9). Officer Isom followed Nwachukwa and observed him jaywalk in violation of Marion City Ordinance 371.03(C). (*Id.* at 10-14). Officer Isom testified:

> At that time I had two violations on him[—jaywalking and trespassing on church property—]and with the way he was actin', I definitely thought something was up, stopped my patrol car roughly five or six yards behind him, and got out and asked him if I could talk to him, turned around, walked back to me.

(*Id.* at 14-15).

{¶16} According to Officer Isom, Nwachukwa did not have identification, but he initially provided his name as "Tony James" and later provided a bus ticket in the name of "Tony Smith." (*Id.* at 15). When asked why the name on the bus ticket was different than the name he provided Officer Isom, Nwachukwa

responded that he did not have his identification with him when he purchased the ticket. (*Id.* at 16). As a result, Officer Isom testified that the following exchange took place:

> I was honest with him and said, 'Hey, we get a lot of drugs comin' in from Detroit' and that's where he said he was from and the way he was actin' and I explained to him his violations and he said he understood, he knew a lot of drugs came in from Detroit but he wasn't doing that.

(*Id.*).

**{¶17}** Officer Isom testified that he asked Nwachukwa if he had anything illegal on him, which he denied, and asked if he could search him, to which Nwachukwa consented. (*Id.* at 16-17). According to Officer Isom, he searched Nwachukwa's person, but did not find anything. (*Id.* at 17). At that point, Officer Isom asked Nwachukwa if he could search his backpack, to which Nwachukwa consented, according to Officer Isom. (*Id.*). After Nwachukwa consented to having his backpack searched, Officer Isom testified that he requested the canine unit to assist in the search. (*Id.* at 18). After the canine sniffed the backpack, Officer Isom testified that he asked Nwachukwa if he could search the backpack, to which Nwachukwa again consented. (*Id.*). Officer Isom also testified that Nwachukwa told him that he had marijuana in the backpack. (*Id.* at 18-19). In his

search of the backpack, Officer Isom testified that he found "[a] large amount of heroin and decent – decent size bag of marijuana." (*Id.* at 18). The heroin was in plastic bags and wrapped up in a shirt, and the marijuana was also packaged in bags. (*Id.* at 18-19). Nwachukwa denied that the heroin was his. (*Id.* at 19). According to Officer Isom, it was approximately 15 to 20 minutes from the time he asked Nwachukwa if he could talk to him until the time he found the heroin, and Nwachukwa did not ask to leave during the duration of the stop. (*Id.* at 19-20). Officer Isom arrested Nwachukwa after the drugs were found. (*Id.*).

{¶18} On cross-examination, after looking at his police report, Officer Isom revised his testimony and testified that the woman to whom he issued the traffic ticket informed him that she was going to the Greyhound station "to pick someone up" instead of his testimony that "she was going to pick up a friend." (*Id.* at 23). (*See also* Defendant's Ex. 1). Officer Isom testified that he stopped Nwachukwa for jaywalking, but did not cite him for that offense. (*Id.* at 29).

{¶19} Detective Elliott testified that he was assigned to the MARMET Drug Task Force on April 20, 2011. (*Id.* at 36). He testified that he was watching a known drug house that day, and he "called a car off to Officer Isom," who later stopped that vehicle and learned that the driver "was going to pick somebody up at the Greyhound Bus Station * * * from Detroit." (*Id.* at 37). After Officer Isom relayed that the driver was on her way to the Greyhound station to pick up a

passenger, Detective Elliott testified that he went to the Greyhound station. (*Id.*). Detective Elliott testified that he was watching passengers exit the bus and that Nwachukwa caught his attention because Nwachukwa "never took eyes off [Detective Elliott's] vehicle." (*Id.*). According to Detective Elliott, "Just thought it was a little odd cause I was nowhere near where he – there was no reason for him to be lookin' in my direction." (*Id.*). Detective Elliott testified that he was driving an unmarked vehicle, was in plain clothing, and was parked approximately 50 to 100 yards from the Greyhound station. (*Id.* at 38-39). He testified that he relayed his observations about Nwachukwa to Officer Isom. (*Id.* at 39).

{¶20} On cross-examination, Detective Elliott testified that Nwachukwa caught his attention because the drug task force received "information from several informants and other people that drugs come in on the Greyhound buses and just the way he was goin' out of his way to keep an eye on my vehicle." (*Id.* at 41). According to Detective Elliott, although he drives an unmarked vehicle, "a lot of the people in town that are known for selling drugs keep an eye on [his] vehicle when they see it." (*Id.*). Detective Elliott testified that he did not witness Nwachukwa violate any laws and did not see him jaywalking; however, he testified that Officer Isom told him that he saw Nwachukwa jaywalk and that Officer Isom was going to stop him based on that violation. (*Id.* at 41-42).

{¶21} On redirect examination, Detective Elliott testified that he conducts some of his drug investigations by surveilling passengers exiting Greyhound buses. (*Id.* at 44).

{¶22} The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution generally prohibit warrantless searches and seizures, and any evidence that is obtained during an unlawful search or seizure will be excluded from being used against the defendant. *State v. Steinbrunner*, 3d Dist. Auglaize No. 2-11-27, 2012-Ohio-2358, ¶ 12, citing *Mapp v. Ohio*, 367 U.S. 643, 649, 81 S.Ct. 1684 (1961). "'Neither the Fourth Amendment to the United States Constitution nor Section 14, Article I of the Ohio Constitution explicitly provides that violations of its provisions against unlawful searches and seizures will result in the suppression of evidence obtained as a result of such violation, but the United States Supreme Court has held that the exclusion of evidence is an essential part of the Fourth Amendment.'" *State v. Gartrell*, 3d Dist. Marion No. 9-14-02, 2014-Ohio-5203, ¶ 51, quoting *State v. Jenkins*, 3d Dist. Union No. 14-10-10, 2010-Ohio-5943, ¶ 9, citing *Mapp* at 649 and *Weeks v. United States*, 232 U.S. 383, 394, 34 S.Ct. 341 (1914).

{¶23} "At a suppression hearing, the State bears the burden of establishing that a warrantless search and seizure falls within one of the exceptions to the warrant requirement, and that it meets Fourth Amendment standards of

reasonableness." *Steinbrunner* at ¶ 12, citing *Xenia v. Wallace*, 37 Ohio St.3d 216 (1988), at paragraph two of the syllabus, *State v. Kessler*, 53 Ohio St.2d 204, 207 (1978), and *Maumee v. Weisner*, 87 Ohio St.3d 295, 297 (1999).

**{¶24}** "'One exception to the warrant requirement is that a police officer may conduct an investigative stop if there is a reasonable articulable suspicion of criminal activity.'" *Gartrell* at ¶ 52, quoting *Steinbrunner* at ¶ 13, citing *State v. Keck*, 3d. Dist. Hancock No. 5-03-27, 2004-Ohio-1396, ¶ 11, *State v. Bobo*, 37 Ohio St.3d 177, 179 (1988), and *Berkemer v. McCarty*, 468 U.S. 420, 439-440, 104 S.Ct. 3138 (1984). *See also State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, ¶ 23. "'Notably the threshold is lower to justify an investigatory stop than it is for probable cause to arrest.'" *Gartrell* at ¶ 52, quoting *Steinbrunner* at ¶ 13, citing *State v. Devanna*, 3d Dist. Auglaize No. 2-04-12, 2004-Ohio-5096, ¶ 21. *See also Mays* at ¶ 23. "Once an officer has reasonable suspicion [or probable cause] that an individual may be involved in criminal activity, the officer, in addition to stopping the person for a brief time, may 'take additional steps to further investigate.'" *State v. Spain*, 10th Dist. Franklin No. 09-AP-331, 2009-Ohio-6664, ¶ 22, quoting *State v. Dillon*, 10th Dist. Franklin No. 04AP-1211, 2005-Ohio-4124, ¶ 29.

**{¶25}** "In determining whether reasonable articulable suspicion exists, a reviewing court must look to the totality of the circumstances." *Steinbrunner* at

14, citing *State v. Andrews*, 57 Ohio St.3d 86, 87-88 (1991). "Under this analysis, a court should consider 'both the content of the information possessed by police and its degree of reliability.'" *Id.*, citing *Weisner* at 299 (1999), quoting *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412 (1990). "A police officer's testimony alone is sufficient to establish reasonable articulable suspicion for a stop." *State v. McClellan*, 3d Dist. Allen No. 1-09-21, 2010-Ohio-314, ¶ 38, citing *State v. Claiborne*, 2d Dist. Montgomery No. 19060, 2002-Ohio-2696.

{¶26} A law enforcement officer may also stop an individual based on probable cause that any criminal violation has occurred. *See Dayton v. Erickson*, 76 Ohio St.3d 3, 11-12 (1996) ("we conclude that where an officer has an articulable reasonable suspicion or probable cause to stop a motorist for any criminal violation, including a minor traffic violation, the stop is constitutionally valid"). "[A]n officer who has probable cause necessarily has a reasonable and articulable suspicion, which is all the officer needs to justify a stop." *State v. Haas*, 3d Dist. Henry No. 7-10-15, 2012-Ohio-2362, ¶ 16, citing *Mays* at ¶ 23. When a law enforcement officer conducts a stop based on probable cause that a violation occurred or is occurring, "the stop is not unreasonable under the Fourth Amendment to the United States Constitution even if the officer had some ulterior motive for making the stop, such as a suspicion that the violator was engaging in more nefarious criminal activity.'" *Mays* at ¶ 22, quoting *Erickson* at syllabus.

{¶27} "Probable cause is determined by examining the historical facts, i.e., the events leading up to a stop or search, 'viewed from the standpoint of an objectively reasonable police officer.'" *Bowling Green v. Godwin*, 110 Ohio St.3d 58, 2006-Ohio-3563, ¶ 14, quoting *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657 (1996). "Determination of probable cause that [an] offense has been committed, '"like all probable cause determinations, is fact-dependent and will turn on what the officer knew *at the time he made the stop*."'" (Emphasis sic.) *Id.*, quoting *Erickson* at 10, quoting *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir.1993).

{¶28} Police officers, however, "do not need a warrant, probable cause, or even a reasonable, articulable suspicion to conduct a search when a suspect voluntarily consents to the search." *State v. Riggins*, 1st Dist. Hamilton No. C-030626, 2004-Ohio-4247, ¶ 11, citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041 (1973); *State v. Comen*, 50 Ohio St.3d 206, 211 (1990). Moreover, "[w]here an officer observes a violation of law, lawfully stops that individual in connection with that violation, and, prior to completing the purpose of the stop, asks permission to conduct a search, the request occurs during a lawful detention." *State v. Limoli*, 10th Dist. Franklin No. 11AP-924, 2012-Ohio-4502, ¶ 34, citing *State v. Fowler*, 10th Dist. Franklin No. 10AP-658, 2011-Ohio-3156, ¶ 15, citing *Riggins* at ¶ 21 and *State v. Chiodo*, 10th Dist. Franklin No. 01AP-1064,

2002 WL 500524, *3 (Apr. 4, 2002). "'[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority.'" *State v. Aguirre*, 3d Dist. Seneca Nos. 13-11-19 and 13-11-20, 2012-Ohio-2014, ¶ 12, quoting *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319 (1983). *See also Riggins* at ¶ 14 (the State must show "clear and positive" evidence that consent was freely and voluntarily given), citing *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788 (1968) and *State v. Posey*, 40 Ohio St.3d 420, 427 (1988).

{¶29} "Further, '[i]n the ordinary course of an investigation, a police officer is free to ask a person for identification without implicating the Fourth Amendment.'" *Dillon*, 2005-Ohio-4124, at ¶ 29, quoting *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty.*, 542 U.S. 177, 178, 124 S.Ct. 2451 (2004), citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868 (1968).

{¶30} Nwachukwa argues that being from Detroit and "looking around and look[ing] at [Officer Isom], a uniformed officer in a marked patrol car" do not "amount[] to facts that support a reasonable suspicion of criminal activity." (Appellant's Brief at 8). In support of his argument, Nwachukwa cites *State v. Harris*. 9th Dist. Summit No. 25443, 2011-Ohio-3190. In *Harris*, the Ninth District Court of Appeals concluded that law enforcement "lacked the reasonable

-14-

suspicion of criminal activity necessary to conduct an investigatory stop" after examining the totality of the circumstances of Harris's conduct prior to his stop. *Id.* at ¶ 8. In particular, the Ninth District concluded that Harris getting out of a van that was parked in a high-crime area in which the law enforcement officer had made numerous arrests and Harris's walking toward a bar after looking in the law enforcement officer's direction to be insufficient to support a reasonable articulable suspicion of criminal activity. *Id.* This case is distinguishable from *Harris*.

{¶31} Here, we conclude that Officer Isom had probable cause and a reasonable articulable suspicion to stop Nwachukwa after personally observing him commit an offense. That is, because Officer Isom personally observed Nwachukwa jaywalk, Officer Isom had probable cause and a reasonable articulable suspicion to believe that he violated of Marion City Code Section 371.03(C), which provides: "Between adjacent intersections at which traffic control signals are in operation, pedestrians shall not cross at any place except in a marked crosswalk." Officer Isom testified that he observed Nwachukwa cross Church Street, near the intersection of Church and Prospect Streets "probably a good 12, 15, 16 yards west on Church Street [from the crosswalk] and cut across the street, diagonal." (July 27, 2011 Tr. at 13). Officer Isom testified that there are "[s]toplights with crosswalks" at the intersection of Church and Prospect

Streets. (*Id.*). As we stated above, Nwachukwa does not contest the facts of this case, and Nwachukwa did not offer any testimony at the suppression hearing to dispute that he jaywalked. Therefore, based on these facts, an objectively reasonable law enforcement officer could conclude that Nwachukwa violated Marion City Code Section 371.03(C). Accordingly, Officer Isom had probable cause and a reasonable articulable suspicion to stop Nwachukwa for jaywalking. *See Dillon* at ¶ 28; *State v. Barton*, 2d Dist. Montgomery No. 21815, 2007-Ohio-2348, ¶ 12 ("Considering these facts through the eyes of an experienced police officer, reacting to the facts as they unfold before him, we conclude that Officer Poe had * * * probable cause to detain Barton for the minor misdemeanor jaywalking offense[.]"). In addition, because Officer Isom had probable cause and a reasonable articulable suspicion to stop Nwachukwa for jaywalking, that Officer Isom asked Nwachukwa for identification does not offend the Fourth Amendment. *See Dillon* at ¶ 29.

{¶32} We further conclude that Officer Isom could arrest Nwachukwa for the minor-misdemeanor offense of jaywalking because one of the R.C. 2935.26(A) exceptions applied. Under R.C. 2935.26, "When a law enforcement officer is otherwise authorized to arrest a person for the commission of a minor misdemeanor, the officer shall not arrest the person, but shall issue a citation, *unless* * * * the offender cannot or will not offer satisfactory evidence of his

identity." (Emphasis added.) R.C. 2935.26(A)(2). Similar to the defendant in *Dillon*, Nwachukwa did not have identification and provided at least two conflicting names—neither of which is his legal name—after Officer Isom stopped him for jaywalking and asked for his identification. *See Dillon* at ¶ 30. Thus, because Nwachukwa did not have identification and the name he provided to Officer Isom did not match the name on his bus ticket, Officer Isom could prolong his stop of Nwachukwa. *See State v. Pryor*, 2d Dist. Montgomery No. 20800, 2005-Ohio-2770, ¶ 16 ("Pryor's own acts of providing false information about his identity and concealing his status as an unlicensed driver necessarily prolonged the traffic stop and provided [the law enforcement officer] with additional justification for detaining him.").

{¶33} We next address Nwachukwa's argument that he was improperly searched during his detention. As we stated above, "police officers do not need a warrant, probable cause, or even a reasonable, articulable suspicion to conduct a search when a suspect voluntarily consents to the search." *Riggins*, 2004-Ohio-4247, at ¶ 11, citing *Bustamonte*, 412 U.S. at 219. Here, the State showed clear and positive evidence that Nwachukwa freely and voluntarily consented to Officer Isom's searches of his person and his backpack. Prior to completing the purpose of his stop of Nwachukwa, Officer Isom asked Nwachukwa if he could search him. (*Id.* at 17). According to Officer Isom, Nwachukwa said "yes" and that

"[he] could" search him. (*Id.*). After the search of Nwachukwa revealed no evidence of criminal activity, Officer Isom asked Nwachukwa to search his backpack, and Officer Isom testified that Nwachukwa "agreed" to the search. (*Id.*). A canine sniffed Nwachukwa's backpack, and Officer Isom asked Nwachukwa if he could search his backpack, to which Officer Isom testified that Nwachukwa again consented. (*Id.* at 18). Nwachukwa did not offer any testimony at the suppression hearing that he did not freely and voluntarily consent to the searches. The trial court was in the best position to evaluate the veracity of Officer Isom's testimony. *Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, at ¶ 8. Thus, the only evidence in the record was that Officer Isom asked Nwachukwa if he could search him and his backpack and that he freely and voluntarily consented three separate times. *See Aguirre*, 2012-Ohio-2014, at ¶ 13; *Riggins*, 2004-Ohio-4247, at ¶ 23; *State v. Ross*, 3d Dist. Marion No. 9-14-33, 2015-Ohio-1182, ¶ 29.

**{¶34}** Nevertheless, Nwachukwa seems to suggest that his consent was not freely and voluntarily given because "Officer Isom testified that he did not intend him to leave." (Appellant's Brief at 9). Nwachukwa's argument is erroneous. Nwachukwa mischaracterizes Officer Isom's testimony.

**{¶35}** The following exchange took place between Nwachukwa's counsel and Officer Isom:

| [Officer Isom]: | I asked him if he wanted to talk to me. He turned around and walked back to me. |
|---|---|
| [Nwachukwa's counsel]: | So, if he would of just kept walking, you would of let him walk? You're under oath, Officer. |
| [Officer Isom]: | Probably not. |

(July 27, 2011 Tr. at 31). Officer Isom testified that he did not intend Nwachukwa to leave at the time he observed him jaywalk, not at the point he asked Nwachukwa to voluntarily consent to the searches of his person and his backpack as Nwachukwa suggests. As we stated above, Officer Isom had probable cause and a reasonable articulable suspicion to stop Nwachukwa after personally observing him jaywalk in violation of Marion City Code Section 371.03(C). Indeed, Nwachuwka was lawfully detained when Officer Isom asked him to consent to the searches. *See Riggins*, 2004-Ohio 4247, at ¶ 21. Thus, Nwachukwa's argument that he did not freely and voluntarily consent to the searches is meritless.

**{¶36}** For these reasons, we conclude that Nwachukwa freely and voluntarily consented to the search of his person and his backpack while lawfully detained.

**{¶37}** As such, the trial court did not err in overruling Nwachukwa's motion to suppress.

**{¶38}** Nwachukwa's assignment of error is, therefore, overruled.

**{¶39}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW and WILLAMOWSKI, J.J., concur.**

**/jlr**